# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

CATHERINE JONES

**CV. NO. 16-340-JWD-RLB**

VERSUS

**JUDGE JOHN W. deGRAVELLES**

BLUE CROSS BLUE SHIELD
OF LOUISIANA

## RULING AND ORDER

### I.    INTRODUCTION

Before the Court is Defendant Blue Cross Blue Shield Of Louisiana's Motion for Summary Judgment.  ("Motion," Doc. 25).  Plaintiff Catherine Jones has filed an Opposition,  (Doc. 41), and Defendant has filed a Reply in further support of the Motion.  (Doc. 44). Defendant has also filed a Supplement in further support of the Motion for Summary Judgment, (Doc. 47), which Plaintiff has opposed, (Doc. 58), and Defendant has replied in further support of.  (Doc. 62).[1]  Oral argument was held on January 11, 2018.

The Court has reviewed the briefing and applicable law and is prepared to rule.  For the following reasons, Defendant's Motion is granted with respect to Plaintiff's constructive discharge and wrongful termination claims, and the Motion is denied in all other respects.

### II.    FACTUAL AND PROCEDURAL BACKGROUND

In 2005, Plaintiff was hired by Defendant to work as a Medical Review Nurse.  (Doc. 25-3 at 11, 19).[2]  Plaintiff's work generally involved reviewing claims from a medical standpoint to determine if policies issued by Defendant, an insurance company, provided coverage.  (Doc. 25-3

---

[1] The Supplement is styled as a "supplemental motion," but it contains no argument and appears intended simply to provide an additional affidavit in support of the initial Motion.
[2] In citing depositions, the Court uses the pagination provided by the ECF system, not the document's internal pagination.

at 21). Plaintiff used a computer in this work, and "most of the time" she used two computer monitors to examine two or more things at the same time. (Doc. 25-3 at 21). Plaintiff was required to read extensively as part of her work. (Doc. 25-3 at 22). During some of her time working for Defendant she worked at an office, but beginning in 2011 she started working from home. (Doc. 25-3 at 23, 40-41; Doc. 25-4 at 16-18).

According to her deposition testimony, Plaintiff was required to meet certain performance standards, *i.e.*, to review claims "at a certain speed or frequency," as part of her work. (Doc. 25-3 at 24). A January 2015 Job Description that Plaintiff reviewed during her deposition did not discuss a production requirement as part of the job's "essential functions"; however, by its terms the "essential functions" section described "physical demands," a "qualifications" section required an applicant to have the "[d]emonstrated ability to handle multiple tasks in [a] customer friendly manner while maintaining performance standards," and an "accountabilities" section stated that a Medical Review Nurse needed to meet "targeted expectations for staff and unit performance as required by [Defendant] and department management." (Doc. 25-4 at 13-14; *see also* Doc. 25-7 at 1, 3-5 (similar September 2009 job description titling "essential functions" section as "physical requirements")). According to Plaintiff, her position initially did not have production requirements, which were added "several years later." (Doc. 25-3 at 106). During Plaintiff's time with Defendant, she received copies of Defendant's employee handbook, which prohibits disability discrimination and states that employees can receive accommodations for disabilities. (Doc. 25-3 at 38-39; Doc. 25-4 at 15).

In 2009, Plaintiff received a written warning from Elizabeth Nassar, her supervisor, and Brian West, Nassar's supervisor, for "setting up" her own appeal. (Doc. 25-3 at 43-44; Doc. 25-4

at 19).  The warning stated that disciplinary action up to and including termination could result from failing to improve.  (Doc. 25-4 at 19).

In June 2013, Plaintiff received another written warning from Nassar, this time for having fifteen cases on her task list "out of compliance."  (Doc. 25-3 at 44-45; Doc. 25-4 at 20).  According to the warning, Plaintiff was not reviewing all "high priority" cases within three business days and all remaining cases within five business days, as required by "departmental guidelines."  (Doc. 25-4 at 20).  The warning stated that disciplinary action up to and including termination could result from failing to improve.  (Doc. 25-4 at 20).

In July 2013, Plaintiff suffered a stroke, which slowed her typing and caused "right-side weakness" and mobility issues.  (Doc. 25-3 at 27-28).  It also limited her peripheral vision in her right eye, which Plaintiff characterized as "blindness," and she was sometimes only able to see half a page, sentence, or word.  (Doc. 25-3 at 29-30).  Plaintiff's vision problems also caused her to lose her place while reading and slowed her reading.  (Doc. 25-3 at 30).  Plaintiff agreed during her deposition that, if she were using two monitors, her ability to see the right monitor would be limited.  (Doc. 25-3 at 30-31).  Plaintiff has never tried to use a text-to-speech program, although she was willing to.  (Doc. 25-3 at 32).

Plaintiff returned to work in or about August 2013.  (Doc. 25-3 at 46; *see* Doc. 25-4 at 21).

In June 2014, Plaintiff received another written warning from Nassar, again for falling below production standards, which were then "1150 edits and 200 medicals per month."  (Doc. 25-3 at 46-47; Doc. 25-4 at 22).  According to the written warning, Plaintiff had also received a verbal warning for productivity in April 2014.  (Doc. 25-4 at 22).  The written warning again stated that disciplinary action up to and including termination could result from failing to improve.  (Doc. 25-4 at 22).  According to her deposition testimony, one or twice prior to receiving the written

warning, Plaintiff told Nassar in a phone conversation that she was having speed and endurance issues due to the stroke. (Doc. 25-3 at 49-50). Nassar was not "very sympathetic," and Plaintiff did not expressly ask for "help" or accommodations. (Doc. 25-3 at 50). At this time, Plaintiff told no one other than Nassar about her difficulties. (Doc. 25-3 at 54-55).

At some point, Nassar and Plaintiff also had a "computer facilitated discussion" concerning the June 2014 warning. (Doc. 25-3 at 51). Plaintiff says that she did not realize until she started getting warnings that she was not meeting production standards, but she does not believe that Nassar would "fabricate" concerns about her. (Doc. 25-3 at 51-52). Plaintiff did not recall Nassar ever saying that Plaintiff would be fired or could be fired as a result of the warnings. (Doc. 25-3 at 54).

In August 2014, because she was concerned about language in the warnings indicating that she could be fired for failing to improve, Plaintiff emailed Sherri Hunt in Defendant's human resources department and asked whether her limitations "qualifie[d] for disability." (Doc. 25-3 at 53-55; Doc. 25-4 at 23-26). Plaintiff also requested that her condition not be disclosed to Nassar; Plaintiff felt Nassar was "hostile" because she had given numerous warnings about Plaintiff's performance and at one point had said that Plaintiff was "making excuses" for failure to meet production standards. (Doc. 25-3 at 56-57).

As a result of her email, Plaintiff was referred to Wanda Riddick, a human resources employee. (Doc. 25-3 at 58). Riddick provided forms to complete, and Plaintiff submitted medical documentation to substantiate her disability. (Doc. 25-3 at 59-60; Doc. 25-4 at 27-31). In the documentation, Plaintiff's physician, Dr. G. Douglas Say, stated that Plaintiff had right hand weakness, reading took Plaintiff "slightly longer than usual," and Plaintiff might require more time to read. (Doc. 25-4 at 29-30).

Riddick emailed Plaintiff, saying that she was "unable to determine" what specific accommodations Plaintiff was seeking and asked "exactly what [she was] requesting," and Plaintiff asked what the "usual accommodations" were, as her situation was "so new to [her]." (Doc. 25-4 at 38; Doc. 25-5 at 27). Riddick replied that every accommodation was "assessed on an individual basis," Plaintiff had to "determine what [she] need[ed] to be able to perform the essential functions of [her] job," Riddick was "unable to make that determination or tell [Plaintiff] what [she] need[ed] to request," and there were no "usual accommodations" that Riddick had "encountered" for someone in Plaintiff's situation. (Doc. 25-4 at 37; Doc. 25-5 at 29). Riddick did not "talk to anybody" other than Plaintiff or "do any research" to answer Plaintiff's question, nor did she consider reassigning Plaintiff, restructuring her position, or modifying her job "to meet the requirement of compliance with the production standards." (Doc. 25-5 at 29-30, 33-37, 57-58). Riddick asked, however, what Plaintiff needed to perform her job, what restrictions she was experiencing from being partially blind, and whether she would need a screen magnifier. (Doc. 25-3 at 61-62; Doc. 25-4 at 37). Plaintiff responded that she did not know what would help her, and she would "mosey along and hope for the best." (Doc. 25-3 at 37; Doc. 25-4 at 32). Riddick asked what "issues" Plaintiff had been having, and Plaintiff stated that her vision had "had an impact" on her work and, while she could "do the work," she was not as fast as she previously was. (Doc. 25-4 at 36-37). Plaintiff also asked how to "apply for partial and total disability," and Riddick directed her to another employee for "specifics." (Doc. 25-4 at 36-37).

Plaintiff began experiencing computer problems while working from home, and she reported in an August 30, 2014 email to Nassar and West that she wanted to return to the office to work on a regular schedule. (Doc. 25-3 at 66-68; Doc. 25-4 at 40). Plaintiff's email said that "[d]riving has its challenges, but [she] would rather deal with that than the criticism [she]

receive[d] from [her] supervisor" and reiterated that Nassar probably would not "believe [her]" and would think she was "only making excuses."  (Doc. 25-3 at 69; Doc. 25-4 at 40).  She also requested larger monitors, stating that her "current situation" was not working and she was being "penalized and criticized" for something she had no control over.  (Doc. 25-4 at 40).

Riddick told Plaintiff that she had ordered the monitors and that Plaintiff could either work from home until they arrived or come in before that and work without the monitors.  (Doc. 25-3 at 70-71).  Plaintiff ultimately returned before the monitors arrived.  (Doc. 25-3 at 71-72).  During her deposition, Plaintiff stated that an unidentified person told her on an unspecified date that, to get the monitors, she had to return to the office.  (Doc. 25-3 at 72-73).  After Plaintiff received the larger monitors, she did not suggest any other accommodations and was unaware of any further accommodations or resources that were available.  (Doc. 25-3 at 74-75).  Ultimately, the monitors arrived and Plaintiff began to use them.  (Doc. 25-3 at 75; Doc. 25-4 at 45).

According to her deposition testimony, Plaintiff continued to have difficulty meeting her production goals after the large monitors were installed.  (Doc. 25-3 at 75).  In December 2014, Plaintiff received another written warning for low productivity, this time for failing to meet a goal of "250 medical cases per month," and had a conversation with Nassar about her productivity.  (Doc. 25-3 at 76-77; Doc. 25-4 at 46).  The warning again cautioned Plaintiff that failure to improve could result in further action up to and including termination.  (Doc. 25-4 at 46).  Plaintiff does not recall whether she discussed her health or her use of the monitors with Nassar at that time.  (Doc. 25-3 at 77).  Between the time when Plaintiff started using the large monitors and the time when she left Defendant's employ, she did not tell anyone that the large monitors were not helping her.  (Doc. 25-3 at 77-78).

During one week in December 2014, Plaintiff's team was required to work four overtime hours, ostensibly due to being "[d]own one position" and receiving a "[s]ignificant influx" of cases to review. (Doc. 25-3 at 78-79; Doc. 25-4 at 48). Plaintiff emailed Riddick to say that she would have difficulty driving home in the dark due to her "partial blindness" and that she would "have to resign" if she was "forced to make this choice." (Doc. 25-4 at 48). Riddick suggested that Plaintiff work from home, to which Plaintiff responded that her equipment was "very limited," or that Plaintiff have someone drive her to and from work, which Plaintiff said was "not an option" because there was no one she could ask to do that. (Doc. 25-3 at 80-81; Doc. 25-4 at 47-48).

Effective December 31, 2014, Plaintiff resigned from her employment with Defendant. (Doc. 25-3 at 82; Doc. 25-4 at 49-50). In her December 24, 2014 email tendering her resignation, Plaintiff said that she was resigning "in lieu of being let go as stated in my last meeting with you." (Doc. 25-3 at 82-83). According to her deposition testimony, Plaintiff was referring to a meeting following her return to the office where she, West, and Kendric Stewart (who was "in the chain of command") had discussed Plaintiff's production and impairments and whether Plaintiff had asked to return to the office to work, and West said "something" about Plaintiff being "let go," which Plaintiff was "thinking [] may have" been "linked" to Plaintiff's productivity, although Plaintiff was unable to provide "a specific." (Doc. 25-3 at 82, 84-87). During her deposition, Plaintiff testified that she resigned because of what she perceived as "repeated" threats of being fired. (Doc. 25-3 at 111).

Shortly after tendering her resignation, Plaintiff attempted to rescind it, apparently so that she could remain eligible for rehire; however, according to an e-mail from Defendant's employee relations manager, it was not Defendant's policy to permit a resigning employee to rescind their resignation. (Doc. 25-3 at 88-89; Doc. 25-4 at 51-52; Doc. 25-5 at 54-57). According to an

affidavit by Lynne Broussard, Defendant's Vice President of HR Business Solutions, Plaintiff's position was filled by an individual who self-identifies as disabled. (Doc. 25-7 at 2).

During her deposition, Plaintiff said that Defendant was not "knowledgeable about people with [her] disability" and offered "no assistance," and she thought it was "strange" that she had to give Defendant information about what she needed. (Doc. 25-3 at 91-92).

## III.   DISCUSSION

### A.  General Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

### B. Parties' Arguments

#### i. Defendant's Motion for Summary Judgment

With respect to Plaintiff's failure-to-accommodate claims,[3] Defendant accepts for purposes of the Motion that Plaintiff was disabled but argues that, following her stroke, she was unable to meet production standards that were required by her job and was therefore not qualified for her position. (Doc. 25-1 at 10-12). Next, Defendant argues that Plaintiff failed to request an accommodation for nearly a year following her stroke and then made virtually no suggestions as to what accommodations would be helpful and did not tell anyone that the accommodations that she did receive were ineffective. (Doc. 25-1 at 12-20). Defendant specifically argues that it had no obligation to learn what accommodations might be available to Plaintiff and that it provided the accommodations that she requested. (Doc. 25-1 at 16-17, 19-20). Finally, Defendant contends that it did not force Plaintiff to resign or create an "intolerable work environment," and Plaintiff therefore cannot state a constructive discharge or wrongful termination claim. (Doc. 25-1 at 20-21).

#### ii. Plaintiff's Opposition

In her Opposition, Plaintiff argues that she was qualified for her job and performed it adequately for several years prior to her stroke; the "essential functions" of Plaintiff's job are vague and "were increased after [Defendant's] knowledge of [Plaintiff's] disability and subsequent difficulties meeting these quotas due to her disability"; and Plaintiff made "not one (1) but three (3) requests for reasonable accommodations." (Doc. 41 at 1-2). Plaintiff contends that Defendant failed to provide reasonable accommodations, "unilaterally broke off" the interactive process, and constructively discharged Plaintiff. (Doc. 41 at 6).

---

[3] The Motion also addresses potential retaliation claims, but Plaintiff has stated that there are no retaliation claims raised in this case. (Doc. 66 at 2).

Plaintiff maintains that there is a "specific genuine issue of material fact" as to what the essential functions of Plaintiff's job were, as they are at most vaguely mentioned in Plaintiff's job description and have changed over time. (Doc. 41 at 8-10). Plaintiff also contends that Defendant "refused" Plaintiff's doctor's request for extra time and increased her production requirement. (Doc. 41 at 12). Plaintiff also states that, after the larger monitors proved ineffective, Defendant never identified or offered other possible accommodations or discussed the issue further with Plaintiff. (Doc. 41 at 13). Plaintiff maintains that, according to case law and EEOC regulations, she was not required to formulate an effective accommodation on her own, and Defendant wrongfully broke off the interactive process required under the ADA. (Doc. 41 at 15-26). With respect to her constructive discharge and wrongful termination claims, Plaintiff claims that she was "threatened with termination multiple times" due to her failure to meet production standards and states that she was "informed that her termination was imminent" in the meeting with West and Stewart. (Doc. 41 at 27-31).

### iii. Defendant's Reply

In its Reply, Defendant reiterates many of the arguments made in its Motion and requests that several exhibits and statements in support of the Opposition be struck or not considered.[4] (Doc. 44 at 1-2). Defendant also argues that the "precise [production] standard" to be met need not be listed in Plaintiff's job description to be deemed essential and Plaintiff was regularly notified of the applicable production standards in written and oral warnings, including ones given before

---

[4] The Court denies the request to strike with respect to any statements or documents not specifically addressed in this order, as the statements or documents either concern issues that are only tangentially related to whether summary judgment is proper or do not change the disposition of Defendant's Motion. *See, e.g., Donihoo v. Dallas Airmotive, Inc.*, 1998 WL 574770 at *2 (N.D. Tex. Aug. 31, 1998) ("As a preliminary matter, the Court must consider [the] defendant's motion to strike portions of [the] plaintiff's response. Specifically, [the] defendant asserts that the third paragraph in the relevant facts section of [the] plaintiff's response is a factual contention which lacks evidentiary support. Because the Court has found it unnecessary to rely upon the statements contained in paragraph three of the response, [the] defendant's motion to strike is denied as moot." (capitalization altered)).

Plaintiff's stroke. (Doc. 44 at 2-3). Next, Defendant argues that Plaintiff broke off the interactive process by providing "minimal information" and failing to tell Defendant that her accommodations were not helping. (Doc. 44 at 3-4). Finally, with respect to Plaintiff's constructive discharge claim, "simply being warned that poor job performance could result in termination is not sufficient to support a constructive discharge claim." (Doc. 44 at 4-5).

#### iv. Defendant's Supplement

Defendant's Supplement consists principally of an affidavit by Nassar stating that all medical review nurses are required to meet minimum production standards, which are announced on a regular basis; the standards change based on work volume and the department's ability to meet existing standards; and, at a July 28, 2014 meeting, it was announced that all medical review nurses would have to perform 1,300 edits and 250 medical reviews per month starting September 1, 2014. (Doc. 47-1 at 1-2). In opposition, Plaintiff argues that Nassar's statements are "pertinent evidence" but not "conclusive" as to whether meeting production requirements is an essential function, particularly given that they were not listed as "essential functions" in written descriptions of Plaintiff's job duties and Plaintiff has testified that there were initially no such requirements when she began working for Defendant. (Doc. 58 at 1-3). In reply, Defendant argues that the "essential functions" section of the job description concerns only "physical demands" on an employee and Plaintiff confirmed during her deposition that she was required to review cases at a certain speed. (Doc. 62 at 2-3).

### C. Analysis

#### i. Essential Functions

To state a prima facie claim under the ADA, a plaintiff must first show that she is a "qualified individual with a disability." *Feist v. Louisiana Dept. of Justice, Office of the Atty.*

*Gen.*, 730 F.3d 450, 452 (5th Cir. 2013).  To make this showing, the plaintiff must demonstrate that she could perform the essential functions of her job, either in spite of her disability or with the assistance of a reasonable accommodation.  *See E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014).  A function is "essential" if it "bears more than a marginal relationship to the employee's job."  *See id.*  Under EEOC regulations, evidence of whether a function is "essential" includes, but is not limited to:  the employer's judgment as to which functions are essential; written job descriptions prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the incumbent to perform the function; the terms of a collective bargaining agreement; the work experience of past incumbents in the job; and the current work experience of incumbents in similar jobs.  29 C.F.R. § 1630.2(n)(3).

The Court concludes that there is a genuine issue of material fact concerning whether Plaintiff was able to perform the essential functions of her position.  Relevant job descriptions state that an employee must be able to meet "targets" or "targeted expectations" set by Defendant and department management, (Doc. 25-4 at 13; Doc. 25-7 at 4), but these descriptions are extremely vague as to what exactly is meant by "targets" or "targeted expectations," the process by which these targets are set and what relationship they bear to Defendant's overall workflow, or how strictly these requirements are enforced.  *See Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1257-61 (11th Cir. 2007) (district court relied "almost exclusively" on existence of tardiness policy in granting summary judgment to employer, stating that employer had "discretion to determine what job functions are essential";  Eleventh Circuit reversed based on testimony that plaintiff's position was not "time sensitive" and "precise punctuality didn't matter," and there was no record evidence regarding effects of employee's tardiness on employer's business).  Similarly, although

Plaintiff acknowledged at her deposition that she was required to meet certain performance standards, *i.e.*, to review claims "at a certain speed or frequency," as part of her work, (Doc. 25-3 at 24), the nature and content of these standards at all times relevant in this action, and whether Plaintiff would have been able to meet them with or without an accommodation, is unclear. While the statements of Defendant's employees are relevant evidence, they are not conclusive, particularly given that this inquiry is highly contextual, fact intensive, and dependent on a number of factors. *See, e.g., Orr v. Echosphere, L.L.C.*, 2006 WL 435125, at *3 (N.D. Tex. Feb. 23, 2006) ("[D]etermining the essential functions of a given job is a fact inquiry with many considerations."). In light of the ambiguous and sometimes vague evidence on this issue, summary judgment on this issue is improper.

### ii. Request for Accommodations and Interactive Process

The ADA forbids covered employers from "discriminat[ing] against a qualified individual on the basis of disability" regarding the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability [. . .] unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). To state a failure to accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist*, 730 F.3d at 452 (internal quotation marks omitted).

An employee who needs an accommodation has the responsibility of informing her employer and, where the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests "primarily upon the employee [. . .] to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (citing *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)). The employee's request for accommodations "must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason, but the employee need not mention the ADA or use the phrase 'reasonable accommodation.'" *Chevron Phillips*, 570 F.3d at 621.

When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in "flexible, interactive discussions to determine the appropriate accommodation." *Griffin*, 661 F.3d at 224. EEOC regulations state that an employer should initiate the interactive process, but the interactive process requires the input of the employee as well as the employer. *Loulsgeld v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999) (citing 29 C.F.R. § 1630.2(o)(3)). Both parties cite favorably the following language, found in *Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3rd Cir. 1999):

> An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer [. . .] [B]oth parties bear responsibility for determining what accommodation is necessary. [. . .] [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.* at 312 (quoting *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir. 1996)); *see also Griffin*, 661 F.3d at 224 (employer cannot be held liable under ADA where breakdown of interactive process is attributable to employee, not employer).

To be actionable, a failure to accommodate must affect the terms, conditions, or privileges of employment, but it is unnecessary to show a separate "adverse employment action" in a failure to accommodate case. *See Picard v. St. Tammany Par. Hosp.,* 611 F. Supp. 2d 608, 620 (E.D. La. 2009).

The Court cannot conclude that Plaintiff notified Defendant of her desire for accommodations until her express request to Hunt in August 2014. According to Plaintiff's testimony, on some earlier date she told Nassar in a phone conversation that she was having speed and endurance issues due to her stroke, but she did not ask for "help" or accommodations. (Doc. 25-3 at 49-50). According to the Fifth Circuit's formulation, however, a request for reasonable accommodation includes a request for "adjustment in working conditions or duties," and, as Plaintiff's disability, limitations, and reasonable accommodations were not open, obvious, and apparent during this conversation, it was Plaintiff's burden to inform Defendant of each of these components of her need for accommodations. *Chevron Phillips*, 570 F.3d at 621; *see also Taylor*, 184 F.3d at 313 ("[W]hile the notice does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability. [. . .] Employers cannot assume employees are disabled and need accommodations."); *Garner v. Chevron Phillips Chem. Co.*, 834 F. Supp. 2d 528, 565 (S.D. Tex. 2011) (granting summary judgment on "reasonable accommodations" issue because, although plaintiff gave employer notice

of her diagnoses, symptoms, and medications, she did not ask for any accommodations, believing that her employer would "come to [her] and say so" if they believed she needed accommodations).

With respect to Plaintiff's later request for accommodations, however, there is a genuine issue for trial as to whether Plaintiff received a reasonable accommodation and whose actions led to a breakdown in the interactive process. In paperwork substantiating her disability, Plaintiff's doctor stated that she "may require" more time to read. (Doc. 25-4 at 30). As the Court discussed previously, Riddick emailed Plaintiff, saying that she was "unable to determine" what specific accommodations Plaintiff was seeking and asked "exactly what [she was] requesting," and Plaintiff asked what the "usual accommodations" were, as her situation was "so new to [her]." (Doc. 25-4 at 38; Doc. 25-5 at 27). Riddick replied that every accommodation was "assessed on an individual basis," Plaintiff had to "determine what [she] need[ed] to be able to perform the essential functions of [her] job," Riddick was "unable to make that determination or tell [Plaintiff] what [she] need[ed] to request," and there were no "usual accommodations" that Riddick had "encountered" for someone in Plaintiff's situation. (Doc. 25-4 at 37; Doc. 25-5 at 29). Riddick did not "talk to anybody" other than Plaintiff or "do any research" to answer Plaintiff's question, nor did she consider reassigning Plaintiff, restructuring her position, or modifying her job "to meet the requirement of compliance with the production standards." (Doc. 25-5 at 29-30, 33-37, 57-58). Riddick asked, however, what Plaintiff needed to perform her job, what restrictions she was experiencing from being partially blind, and whether she would need a screen magnifier. (Doc. 25-3 at 61-62; Doc. 25-4 at 37). Plaintiff responded that she did not know what would help her, and she would "mosey along and hope for the best." (Doc. 25-3 at 37; Doc. 25-4 at 32). Riddick asked what "issues" Plaintiff had been having, and Plaintiff stated that her vision had "had an impact" on her work and, while she could "do the work," she was not as fast as she previously

was. (Doc. 25-4 at 36-37). Plaintiff also asked how to "apply for partial and total disability," and Riddick directed her to another employee for "specifics." (Doc. 25-4 at 36-37).

Plaintiff can be faulted for much of the breakdown in the interactive process. Her physician noted an extremely general limitation, *i.e.*, that Plaintiff may require more time to read, and did not name any other specific accommodations that might be appropriate in Plaintiff's situation, nor was Plaintiff able to provide much clarification. Moreover, Plaintiff's decision to "mosey along and hope for the best" largely ended whatever was left of the interactive process when her statement was made. However, when Plaintiff made inquiries about what was "standard" in her situation, Riddick's responses that Plaintiff had to "determine what [she] needed" and that Riddick was "unable to make that determination or tell [Plaintiff] what [she] need[ed] to request" might have indicated to a reasonable employee that her employer was unwilling to meaningfully consult with her about what accommodations might be helpful. Although Riddick asked some follow-up questions, Plaintiff was largely left to determine on her own what would be reasonable for her. Riddick also performed no research or inquiry and did not consider reassigning Plaintiff or modifying Plaintiff's job, (Doc. 25-5 at 29-30, 33-37, 57-58); while Defendant may not have been required to take any of the specific actions or provide any of the specific accommodations suggested by Plaintiff, a reasonable jury might find that Defendant's few emails to Plaintiff did not constitute good faith participation in the interactive process. *See Chevron Phillips*, 570 F.3d at 621-22 ("Netterville was not required to come up with the solution (*i.e.*, a CPChem location closer to home) on her own. Under the ADA, once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that together they can determine what reasonable accommodations might be available."). There is also no evidence that Defendant meaningfully considered or discussed with Plaintiff her initial request for more

time to read. Additionally, as the Court discussed in ruling on some of Defendant's motions in limine, there is evidence that there were accommodations available that would have helped Plaintiff perform her duties.

In short, there is some evidence that each party contributed meaningfully to the breakdown in the interactive process. *Taylor*, 184 F.3d at 312. In such circumstances, the Court concludes that summary judgment is inappropriate.

### iii. Constructive Discharge and Wrongful Termination Claims

Plaintiff also raises constructive discharge and wrongful termination claims. The ADA provides that no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to, inter alia, "the hiring, advancement, or discharge of employees [. . .] and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a wrongful termination claim under the ADA, a plaintiff must show that: (1) she was an individual with a disability; (2) she was qualified for her job, despite her disability; and (3) she was discharged because of her disability. *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 854 (5th Cir. 2010). The Court has addressed the first two elements of this test *supra*.

Plaintiff resigned her employment and was not formally discharged by Defendant. However, a resignation is actionable under the ADA if the resignation qualifies as a constructive discharge. *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (applying this test in Title VII context); *Robinson v. BGM Am., Inc.*, 964 F. Supp. 2d 552, 575 (D.S.C. 2013) ("To demonstrate a wrongful-termination ADA claim, Plaintiff must show he was terminated. Because Plaintiff argues his resignation was 'forced,' the court considers whether Plaintiff can demonstrate he was constructively discharged." (citation omitted)); *Anderson v. Bellsouth Telecommunications, LLC*, 2015 WL 461698, at *14 (N.D. Ala. Feb. 4, 2015) ("It is well-

established that a plaintiff who voluntarily resigns cannot sustain a claim for wrongful termination under the ADA. But the mere fact that Plaintiff resigned does not end the inquiry because, as a general rule, this legal principle does not apply in the event a resignation is coerced.").

The Fifth Circuit has explained:

"In determining whether an employer's actions constitute a constructive discharge we ask whether 'working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Aryain v. Wal–Mart Stores Texas LP*, 534 F.3d 473, 480 (5th Cir. 2008) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)); *see Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 805 (Tex. 2010). We have previously identified several factors relevant to constructive discharge, including: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not. *Aryain*, 534 F.3d at 481 (quoting *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771–72 (5th Cir. 2001)).

In addition, a plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired. *See Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997); *Jenkins v. State of La., Through Dep't of Corrs.*, 874 F.2d 992, 996 (5th Cir.1989); *Davis v. City of Grapevine*, 188 S.W.3d 748, 766 (Tex. App. 2006). However, in these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable. For example, in *Davis*, the plaintiff presented evidence that his managers informed him that "it would be in his best interest if he decided to resign rather than be terminated because future employers may ask the City whether Davis resigned or was terminated." *Davis*, 188 S.W.3d at 766. Likewise, in *Faruki*, the plaintiff presented testimony that his supervisor had told him he should find another job, and that he had one week before he would be placed on indefinite unpaid leave. *Faruki*, 123 F.3d at 319; *see also Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1027–28 (5th Cir.1992) (holding that employee "reasonably could have believed that his demotion was a harbinger of dismissal" where there was a demotion, continuing limitations on the employee's salary and responsibility, and a supervisor repeatedly asked him whether he was going to quit his job).

*Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338–39 (5th Cir. 2014) (formatting altered).

Summary judgment is appropriate on this issue. While a constructive discharge plaintiff need not show that an employer specifically intended to force resignation, constructive discharge

does require "a greater degree of harassment than that required by a hostile environment claim," *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 167 (5th Cir. 2007), which is itself subject to a "high bar." *Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F.Supp.2d 849, 874 (S.D. Tex. 2007) ("[H]ostile work environment cases have traditionally set a high bar for the amount and type of proof necessary to proceed on the claim.").

Here, the primary evidence in support of Plaintiff's claim is that, in her December 24, 2014 email tendering her resignation, Plaintiff said that she was resigning "in lieu of being let go as stated in my last meeting with you," which, according to her deposition testimony, referred to a meeting sometime between September 2014 and December 2014. (Doc. 25-3 at 82-84). Plaintiff's recollection of this meeting is extremely vague, however: at most, she states that her production and impairments were discussed, and West said "something" about Plaintiff being "let go," which Plaintiff was "thinking [] may have" been "linked" to Plaintiff's productivity, although Plaintiff was unable to provide "a specific." (Doc. 25-3 at 85-88).

Even combined with Nassar's comment about "making excuses" (nearly four months before Plaintiff resigned) and standard form language concerning discipline "up to and including termination" (common to multiple warnings that Plaintiff had received over several years), Plaintiff's vague allegations satisfy virtually none of the factors that the Fifth Circuit has found relevant in constructive discharge cases. Plaintiff also observes that her workload increased following her return to work; although the increase may not have "singled out" Plaintiff, Plaintiff argues that an employer can violate the ADA by "treat[ing] a disabled employee the same as a non-disabled employee." *See Riel v. Elec. Data Systems Corp.*, 99 F.3d 678, 681 (5th Cir. 1996). The Court acknowledges this general principle, but, considering the high quantum of proof necessary and the relevant factors, Plaintiff's showing falls well short of creating a triable issue of

fact on whether a reasonable employee would have felt compelled to resign. *Perret*, 770 F.3d at 338; *see also Brown*, 237 F.3d at 566 (district court should have granted judgment as a matter of law on constructive discharge claim; plaintiff's allegations that he was repeatedly denied promotions and transfer opportunities and was transferred to a store that was continually losing money were "insufficient for a finding that a reasonable employee in Brown's position would have felt compelled to resign"); *Shryer v. Univ. of Texas Sw. Med. Ctr. at Dallas*, 587 F. App'x 151, 157 (5th Cir. 2014) ("The sum of Shryer's evidence is that Calver gave her poor performance reviews, sighed and occasionally commented on her mobility in her presence, asked if she had a medical condition, and expressed frustration to Bradford that Shryer was not adequately carrying out her responsibilities. Even accepting Shryer's version of the facts, her working condition in the Department does not approach an 'intolerable' level that would compel a reasonable employee to transfer or resign."). Similarly, given the vagueness of her allegations, Plaintiff's subjective belief that termination was imminent and that she had been presented with a "resign-or-be-fired" ultimatum essentially stands without record support and is insufficient to withstand a summary judgment motion. *Perret*, 770 F.3d at 338.

To the extent that Plaintiff attempts to raise distinct claims related to her subsequent unsuccessful attempt to rescind her resignation, the Court concludes that these claims also fail under the circumstances of this case. *See Brown*, 237 F.3d at 566 (in analogous Title VII case, resignation was only actionable, "allowing the plaintiff to seek compensatory damages for events after the resignation," if it qualified as a constructive discharge); *Gingold v. Bon Secours Charity Health Sys.*, 768 F. Supp. 2d 537, 545 (S.D.N.Y. 2011) ("Bon Secours's obligations to Gingold under the ADA terminated upon Gingold's delivery of his resignation notice on July 20, 2007."); *Rush v. Verizon Va., Inc.*, 2004 WL 2900654, at *3 (W.D. Va. Dec. 9, 2004) ("The court finds that

Verizon ceased to owe Rush any duty under the ADA upon her resignation, which Verizon was entitled to treat as final. Thus, Verizon was under no obligation to rehire Rush after she tendered a resignation.") (citing *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1256 n. 5 (4th Cir. 1985)); *Beebe v. SwedishAmerican Hosp.*, 2001 WL 1143253, at *1 (N.D. Ill. Sept. 28, 2001) ("It is questionable whether a company's refusal to rescind a voluntary resignation could be considered an adverse employment action [under the ADA.]"); *EEOC v. United Air Lines, Inc.*, 2000 WL 1738346, at *12 (N.D. Ill. Nov. 21, 2000) (employer's refusal to permit employee to rescind resignation does not violate the ADA).

In light of the foregoing, Plaintiff's constructive discharge and wrongful termination claims fail, and summary judgment will be granted with respect to these claims.

### D. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant's Motion (Doc. 25) is **GRANTED** with respect to Plaintiff's constructive discharge and wrongful termination claims. The Motion is **DENIED** in all other respects.

Signed in Baton Rouge, Louisiana, on <u>January 29, 2018</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**